IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2016

**SAIDRICK T. PEWITTE v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-14-301     Donald H. Allen, Judge**

_____

**No. W2015-00883-CCA-R3-PC  -  Filed April 27, 2016**

_____

The petitioner, Saidrick T. Pewitte, appeals the denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Saidrick T. Pewitte.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Following a jury trial in 2013, the petitioner was convicted of possession    of    .5 grams or more of cocaine with the intent to sell; possession of .5 grams or more of cocaine with the intent to deliver; possession of a Schedule III controlled substance (dihydrocodeinone) with the intent to sell; possession of dihydrocodeinone with the intent to deliver; and possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony. He received a total effective sentence of twenty-eight years in the Department of Correction. His convictions and sentences were affirmed by this court on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. State v. Saidrick Tiwon Pewitte, No. W2013-

00962-CCA-R3-CD, 2014 WL 1233030, at *1 (Tenn. Crim. App. Mar. 25, 2014), perm. app. denied (Tenn. June 20, 2014).

The underlying facts were recited by this court on direct appeal as follows:

Investigator Samuel Gilley of the Jackson Police Department Gang Enforcement Team testified that he served a search warrant on the afternoon of October 5, 2011, at the [petitioner's] home. The [petitioner] was listed as the subject of the search warrant. Curtis Goyer and Christian Ellison were observed to enter the home immediately prior to the search. The police knocked on the front door, announced their presence, and forcibly entered when no one answered the door. Investigator Gilley said seven or eight officers were involved in executing the search warrant and that he was the last one to enter the residence.

Investigator Gilley described the layout of the residence and said the police focused their investigation on the far left side of the house. This room, previously a garage or carport, had been remodeled into a bedroom with a front door. Investigator Gilley explained that from this room, two or three small steps lead into the kitchen and the main part of the house. Upon his entry through the front door into the remodeled garage, Investigator Gilley observed that Mr. Goyer had been detained "just inside" the door. The [petitioner] was in this room sitting on his bed. Mr. Ellison was detained on the small staircase that led into the kitchen. Investigator Gilley stated that apart from law enforcement, these three men were the only people in the house. After the scene was secured, the police took the men outside to the front yard and executed their search of the residence.

During the search, Investigator Gilley observed the following:

One of the first things that I readily recognized [were] two bags of cocaine that were wrapped individually. Both of them had an approximate field weight of half a gram each. They were on the nightstand in that bedroom . . . that we came in where [the petitioner] was in bed. Directly next to his bed was a nightstand and on top of it were those two bags of cocaine. There was also a clear plastic bag that had nine Lortab pills and three Vicodin pills. This was in a -- tied up in like a sandwich baggy. There was a blue bag that kind of was on the stairs like going from that bedroom area up to the kitchen that had digital scales, some spoons, some plastic

2

bags that had like the corners twisted off. Some of the items had the white powdery residue. There was also an open box of the same type of sandwich bags that the cocaine and the pills were packaged in on the nightstand.

. . . .

There was another bigger bag found inside the kitchen cabinet and I was informed to come over and have it photographed and collected. It was a larger sandwich bag that contained two other individual packages of cocaine. One was approximately 37.4 grams and the other was approximately 13.2 grams.

Investigator Gilley collected the evidence retrieved from the [petitioner's] residence which included two large bags of cocaine recovered from a kitchen cabinet and two small bags of cocaine and a bag of painkiller tablets recovered from the bedroom nightstand. A blue bag containing a digital scale, two spoons, and three twisted plastic bags inside the blue bag was recovered from the steps leading to the kitchen. Investigator Gilley noted, "These are baggies that have been twisted and had the corner twisted torn out of them. I mean, definitely the metal spoon and these baggies have white powdery residue on them . . ."

Investigator Gilley said law enforcement also found "a loaded .38 revolver" in the drawer of the same nightstand from where the two smaller cocaine bags and pills were recovered. Inside the nightstand drawer, there were some bullets and a wallet with $667 in cash and the [petitioner's] Social Security card. There was also a holster and a piece of mail addressed to the [petitioner] at this residence. Investigator Gilley identified these items at trial. He further identified the box of sandwich bags seized from on top of the nightstand. The police also seized a plastic bag containing twenty-seven rounds of ammunition for a. 38 caliber revolver from the [petitioner's] bedroom cabinet. Near these bullets, there was a Crown Royal bag containing $1,395 in cash. The police seized a total amount of $2,062 in cash from the [petitioner].

On cross-examination, Investigator Gilley testified that Mr. Goyer and Mr. Ellison saw the police and "hurried" into the house. He said the Defendant reported having knee problems and required assistance from a wheelchair when the police took him out of the residence.

Christopher Wiser testified that he was a lieutenant with the Jackson Police Department Special Operations Division and the commander of the Gang and K-9 Units. During the search of the Defendant's residence, Lieutenant Wiser explained a rights waiver form to the Defendant and Mr. Goyer. Both men signed the form, which was entered into evidence. Lieutenant Wiser said he interviewed Mr. Goyer at the scene and that the Defendant was the person of interest in the investigation.

Sergeant Phillip Kemper of the Jackson Police Department Gang Enforcement Team testified that he interviewed and took a statement from the [petitioner] during the search of the residence. He identified the [petitioner's] formal adopted statement, which was admitted into evidence without objection. Sergeant Kemper read the [petitioner's] statement into the record, which contained, in pertinent part, the following:

> The powder and pills on the table by my bed belonged to me because I am in a lot of pain and I have a drug problem. The gun that was in the table by my bed was mine. I have had it for about six months because some bad things have gone on in my neighborhood and I'm home by myself a lot and disabled and need protection. My wallet was in there too. I think it had about $650 or so cash that was my disability check. If there was anything else illegal in that house, I do not know about it or where or how it got there. I accept responsibility for what little dope is mine because I am in pain and I have a drug problem. I only have the gun because I was disabled and needed protection.

Brenda McNeil, the evidence custodian for the Jackson Madison County Metro Narcotics Unit, received the following evidence pertaining to the instant case: four bags of cocaine weighing approximately 37.4 grams, 13.2 grams, 0.5 grams, and 0.5 grams, respectively; a plastic bag with nine Lortab pills and three Vicodin pills; and "a blue bag with a black digital scale, two spoons and three bags with the corners torn off" as well as an open box of sandwich bags. Ms. McNeil transported the narcotics to the lab for testing. Ms. McNeil said she was the only person who had custody of the items.

Special Agent Shalandus Harris, a forensic scientist with the Tennessee Bureau of Investigation (TBI) Memphis regional lab, testified as

4

an expert witness in the field of drug analysis and identification. In this case, she received and examined the contents of three plastic bags. Agent Harris performed a color test and an instrumental analysis and determined the substance in the first bag to be cocaine with a weight of 48.04 grams. She did not test the second bag because the statutory weight requirement for cocaine had already been met, with the next cutoff being 300 grams. The third plastic bag contained various tablets which she tested separately. She identified three different types of tablets based on their color and markings. After an instrumental analysis, she found that the tablets tested positive for hydrocodone, a Schedule III controlled substance. She determined the brand names of the tablets to be Lortab and Vicodin. Agent Harris generated an official forensic chemistry report, which was admitted into evidence.

Investigator Rodney Anderson of the Jackson Police Department Gang Unit testified that he took several photographs of items found at the scene of the [petitioner's] residence during the search. He individually identified the photographs, which were entered as a collective exhibit without objection. He said the photographs accurately depicted what he observed at the residence on the day in question.

Christian Ellison, the [petitioner's] cousin, testified that his aunt, uncle, their grandchildren, and the [petitioner] lived at the residence that was searched on October 5, 2011. On that day, Mr. Ellison said he and his uncle, Curtis Goyer, returned to the house at around 1:15 or 1:30 p.m. after a job. When Mr. Ellison went outside "to water the dog," he saw the police arrive. At that point, he "took off into the house" to tell his cousin that the police were outside. He said he alerted the [petitioner] because he knew his cousin "was using drugs and stuff like that." When Mr. Ellison entered the front door into the remodeled garage, he saw the [petitioner] on the bed and Mr. Goyer seated on the couch. He said that "everything happened so fast" by the time the police entered the home. According to Mr. Ellison, when he told the [petitioner] about the police, the [petitioner] threw a purple Crown Royal bag at him. He said he was on the small staircase at the time and that the bag hit him in the chest and fell onto the steps. A white compact substance fell out of the bag onto the floor along with some bags and a scale. Mr. Ellison stated that he did not know what to do and that he grabbed the drugs and "threw them in the cabinet." The bag and other items were "still on the steps where [the police] found it." He said he moved the drugs because he was scared and because he wanted to help his cousin. He stated that the drugs and other items did not belong to him. Mr.

5

Ellison said that the [petitioner] had knee surgery and was taking pain medication and that the [petitioner] had been confined to the hospital bed in his room for months.

Curtis Goyer testified that he was the [petitioner's] stepfather and that he had lived in the residence in question for thirty years. He said the [petitioner] had stayed at his house for four or five years. According to Mr. Goyer, the [petitioner] had fallen a few months before the search and had torn the muscles in both legs. After the fall, the [petitioner] had surgery and stayed on a hospital bed in the den. On the afternoon of October 5, 2011, Mr. Goyer and the [petitioner] were in the den reading their mail when Mr. Ellison told them the police were outside. Mr. Goyer said he saw the police in front of his house with shotguns, but he did not see any interaction between his nephew and the [petitioner]. Mr. Goyer said that before returning to the house, he had been staining a fence with his nephew since around 9:00 a.m. and he did not see Mr. Ellison with any drugs.

Mr. Goyer testified that he was not aware of drugs in his house on the day of the search. He said he had previously observed the [petitioner] use small packets of cocaine on at least two occasions, but he had never seen cocaine in the amount recovered by the police. Mr. Goyer knew that the [petitioner] had a revolver, which he said the [petitioner] had obtained after his injury. He said both he and the [petitioner] kept money locked in the kitchen cabinet. Mr. Goyer stated that the [petitioner] received a monthly disability check of "$800 or $900." He also reported that the [petitioner] had obtained a loan of about $1,500 a few months before the search and that he had taken the [petitioner] to the bank to apply for and accept the loan. He said that the [petitioner] had limited mobility and that he took the [petitioner] "to the bank and to the doctor and to do exercise and stuff like that in a wheelchair." He was also aware that the [petitioner] took "lots of medication." Mr. Goyer said he and his wife did not use any drugs apart from prescribed medication.

The [petitioner] chose not to testify and did not present any proof at trial. Based on the above proof, the jury convicted the [petitioner] as charged on all five counts and assessed a fine of $5,000 for each count. At a subsequent sentencing hearing, the trial court merged the narcotics offenses into one count of possession of .5 grams or more of cocaine with the intent to sell and one count of possession of a Schedule III controlled substance with the intent to sell. For his three felony convictions, the [petitioner] was fined a total of $15,000. The trial court sentenced the

[petitioner] as a Range II, multiple offender to twenty years' imprisonment for the cocaine offense and eight years for the dihydrocodeinone offense. For the firearm offense, the [petitioner] was sentenced to eight years, to be served consecutively to the underlying dangerous felony of possession of cocaine with the intent to sell. See T.C.A. § 39-17-1324(e)(1). The [petitioner] received an effective sentence of twenty-eight years in the Department of Correction.

Id. at *1-4 (footnotes omitted).

The petitioner filed a *pro se* petition for post-conviction relief on December 8, 2014, and following the appointment of counsel, three amended petitions were filed, alleging numerous claims of ineffective assistance of trial counsel.

At the evidentiary hearing, the petitioner testified that he and trial counsel only met two or three times and that counsel did not discuss any trial strategy with him. The petitioner said he was offered one plea bargain for fifteen years, but he refused the offer because he "didn't do nothing." He said that he had been prescribed Vicodin and Lortab for pain related to his July 29, 2010 bilateral knee surgery. He identified a letter from his physician stating that the petitioner underwent several weeks of rehabilitation following his surgery and that he prescribed Hydrocodone to the petitioner "on several occasions around that period (and before October 5, 2011)." Although the petitioner gave this information to trial counsel, counsel presented no evidence at trial that the petitioner lawfully possessed the Hydrocodone. The petitioner admitted that he never produced a prescription from his doctor for the pain medication but said all trial counsel had to do was call his doctor. He acknowledged that his stepfather testified at trial that the petitioner had prescriptions from his doctor.

The petitioner also claimed that trial counsel failed to impeach the petitioner's cousin, Christian Ellison, who testified against him at trial. Mr. Ellison was present at the time of the petitioner's arrest, but when he testified at trial, he "made a totally different statement from what he made at the scene and plus he got on the stand and lied on the stand about what the statement said." Asked what Mr. Ellison testified to at trial that was inconsistent with his statement, the petitioner responded, "He said that I threw a purple bag at him that hit him in the chest and the bag and the cocaine fell on the ground and he picked it up and put it in the cabinet. . . . [H]e said, 'The truth is my cousin, [the petitioner], handed me a bag of cocaine and I put it in the kitchen cabinet for him. That's all I did.'" The petitioner said that he told trial counsel that Mr. Ellison was lying during his testimony and claimed that both trial counsel and the prosecutor knew that Mr. Ellison was being untruthful. The petitioner explained that the cocaine was not his because he was locked inside the house by himself and could not get up. The petitioner

acknowledged that when trial counsel questioned Mr. Ellison about his statement, counsel pointed out that "the statement was different and got [Mr. Ellison] to even admit that the statement didn't say that [the petitioner] threw the bag at him."

As to the search warrant executed at his residence, the petitioner said trial counsel failed to challenge the validity of the warrant on the ground that it did not provide information about the confidential informant who allegedly had seen the petitioner in possession of cocaine within 72 hours. The petitioner said he sent letters to trial counsel and to the court "trying to get that suppressed about what was done wrong, but to no avail."

The petitioner further testified that trial counsel failed to object to prejudicial comments made by the prosecutor during closing arguments. According to the petitioner, the prosecutor said that the petitioner was "sitting there like a knot on a log because [the petitioner] wouldn't testify." He claimed that the prosecutor's comment prejudiced him because "no comment [should have been] made on [his] not testifying."

The petitioner said that trial counsel was ineffective for advising him not to testify although he had wanted to do so. Trial counsel told the petitioner the State would use his prior convictions against him, so he decided to "let [counsel] do his job." The petitioner admitted that he had a prior felony record and that he told the trial judge he did not want to testify.

The petitioner claimed that trial counsel did not adequately explore his poor physical and mental health. He explained that he could not walk and was taking "a lot of medication" at the time of the offenses. He said that if trial counsel had obtained his medical records, the jury would have known that the pain medication had been prescribed for him and more than likely those charges would have been dismissed. The petitioner also claimed that he went into cardiac arrest and "died" about three or four weeks before his arrest; therefore, he was physically unable to get up or obtain cocaine at the time. The petitioner identified his medical records dating from August 3, 2011, to September 30, 2012, which were admitted as exhibits. He said that he was arrested on October 5, 2011.

The petitioner also testified that trial counsel failed to adequately cross-examine and impeach the police officers who testified, specifically Investigator Gilley. According to the petitioner, Investigator Gilley testified that the petitioner's stepfather and Mr. Ellison got out of a truck, walked into the house, and closed the door, which contradicted the investigator's report that two men were standing in the front yard and ran into the house when the officers arrived. The petitioner said neither version was true because he knew his stepfather had gone to the mailbox when he got out of the truck because he

8

handed the mail to the petitioner when he came inside. Mr. Ellison then went back outside to feed the dogs.

Trial counsel testified that he was employed by the public defender's office and had been appointed to represent the petitioner in July 2012. He met with the petitioner about three weeks after he was indicted. Thereafter, they talked in court or by telephone. The petitioner called counsel frequently to discuss his case and his health issues. The petitioner told counsel about his knee surgeries, which was confirmed by the petitioner's stepfather. The petitioner said he was prescribed Hydrocodone for pain and provided counsel a prescription that was dated about five months before the petitioner's arrest. Counsel said he could not find any prescriptions "exactly around the timeframe that [they] could have used for evidence." Counsel noted that the police found the pills in a bag, rather than a prescription bottle, which could have "backfired" against the petitioner. Counsel said he discussed this fact with the petitioner.

Trial counsel recalled that Mr. Ellison testified that he tried to help the petitioner by taking the cocaine to the upstairs kitchen to get it out of the petitioner's downstairs bedroom. Counsel said he cross-examined Mr. Ellison about his prior statement but did not recall the petitioner's asking him to question Mr. Ellison further about the statement. Counsel elaborated, "[G]enerally I always ask [a] defendant do you want to ask the witnesses anything else before I sit down. I try to do that and then if we've exhausted all of the questions then I just move on. I did ask him about that statement."

Regarding the search warrant, trial counsel said he reviewed the affidavit in support of the warrant and believed that it alleged sufficient probable cause. He gave the petitioner a copy of the warrant and explained to him that it was a "good affidavit." Counsel recalled that the confidential informant had seen the petitioner with cocaine at his residence. Investigator Gilley confirmed that the petitioner was on parole at the time and that the confidential informant "had led to a certain number of convictions and recovery of certain amounts of drugs." Counsel said that he believed the affidavit was adequately corroborated and did not believe there were any grounds upon which to challenge the warrant.

Trial counsel said that he did not recall the prosecutor's comment in closing arguments about "a knot on a log or a bump on a log" and that he did not think the comment warranted an objection. However, if the prosecutor had said that the petitioner was "sitting there like a bump on a log and wouldn't testify," that would have "easily been objectionable."

Regarding the petitioner's allegation about trial counsel's not impeaching Investigator Gilley, counsel said he asked Investigator Gilley about his original report,

which said he saw two people run into the house. On cross-examination, the investigator "changed it a little bit to say they hurried into the house." Trial counsel said he tried to bring that up in an effort to impeach Investigator Gilley.

Trial counsel said he "would never tell anybody don't testify." He said if the petitioner had been adamant about testifying, "he would have taken the stand and testified." Counsel said he addressed his concern about the petitioner's prior record but learned it was not an issue because the State agreed not to question the petitioner about it unless the door was opened.

Upon questioning from the trial court, counsel said that the petitioner gave a statement to the police admitting that the items found in his bedroom, including a loaded gun, nine Lortab pills, three Vicodin pills, and two small bags of cocaine, belonged to him.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently entered an order on May 13, 2015, denying the petition for post-conviction relief.

## ANALYSIS

The petitioner argues that trial counsel was ineffective for: (1) failing to investigate whether the petitioner had valid prescriptions for Lortab and Vicodin; (2) failing to "utilize the prior inconsistent statement to impeach the [S]tate's witness, Christian Ellison"; (3) failing to adequately cross-examine Investigator Gilley; (4) failing to challenge the search warrant; (5) advising him not to testify in his own defense; and (6) not objecting to "prejudicial comments made by the prosecutor during closing arguments."

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's

10

findings of fact.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding.  Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).  The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)).  The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one."  466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In denying the petition, the post-conviction court concluded that the advice given and services rendered by trial counsel "were certainly within the range of competence demanded of attorneys representing defendants in criminal cases."  The court elaborated:

11

The Court has carefully reviewed the exhibits marked as evidence in this case, which includes the trial transcripts. I have carefully reviewed the specific portions relative to the direct examination and cross-examination of State's witnesses, Christian Ellison, and Investigator Samuel Gilley. I've also carefully reviewed the transcript of the Closing Arguments made by [trial counsel] and by the [prosecutor].

The Court finds that no improper comments were made by the prosecutor during his final closing argument. He did not improperly comment upon the [petitioner's] decision not to testify at trial. This ground alleged is without merit.

Furthermore, the Court finds that [trial counsel] did properly cross-examine the State's witnesses and did attempt to discredit their testimony, particularly Christian Ellison and Investigator Samuel Gilley.

Additionally, I credit the testimony of [trial counsel] when he testified that in his professional opinion that there was no legitimate basis or grounds upon which to file a Motion to Suppress relative to the search warrant executed in this case. This issue is without merit.

I also credit [trial counsel's] testimony when he testified that he had fully attempted to locate any valid prescriptions that [the petitioner] may have had for the 12 pills of Vicodin or Lortab in the months prior to October 5th, 2011, which was the date that the search warrant was executed and the narcotic pills were recovered.

If anyone could have been able to produce such prescriptions and/or pill bottles with the [petitioner's] name on it, if they existed at all, it would have been [the petitioner]. He had been out on bond in his case for several months prior to his trial date, and should have been able to provide such information to his attorney.

Finally, it does appear from the trial transcript that [the petitioner] did advise the Court under oath . . . that he was choosing "not to testify" at his trial, and that he was making that decision not to testify "freely and voluntarily." I do not find that [trial counsel] was ineffective in advising his client, because it does appear to the Court that the [petitioner], after having been fully advised by the Court of his right to testify and/or his right to not testify . . . clearly made his own decision not to testify in his defense. This issue or ground is without merit.

After a careful review of all the evidence in this case, the Court finds that none of trial counsel's actions or omissions were so serious as to fall below the objective standard of reasonableness under prevailing professional norms. The Court finds that [trial counsel's] representation was appropriate and that he provided [the petitioner] with reasonably effective assistance. The Court further finds that petitioner has failed to show that there is a reasonable probability that, but for trial counsel's performance, the result of the trial proceeding would have been different.

We conclude that the record supports the post-conviction court's finding that trial counsel provided effective representation. The petitioner has failed to show that trial counsel was deficient in his representation. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE